**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LANSING TRADE GROUP, LLC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3155 |
| | § | |
| | § | |
| 3B BIOFUELS GmbH & CO., KG, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Lansing Trade Group, LLC ("LTG"), a Kansas commodity trading firm, sued 3B Biofuels GmbH & Co. KG, a German company, for breach of an installment contract. Under the contract, 3B Biofuels agreed to buy a certain quantity of biodiesel fuel at a fixed price in six separate shipments over a six-month period. In this suit, LTG alleges that 3B Biofuels wrongfully repudiated the contract after two of the six deliveries were completed because the market price of biodiesel went down and 3B Biofuels wanted out of the fixed-price contract. 3B Biofuels asserts that it was entitled to reject the contract because the third delivery was late and the biodiesel shipped did not conform to the amount or quality specified in the contract.

3B Biofuels has moved to dismiss for lack of personal jurisdiction. (Docket Entry No. 8). LTG responded, (Docket Entry No. 11), and 3B Biofuels replied, (Docket Entry No. 20). Based on a careful review of the motion, response, and reply, the parties' submissions, and

the applicable law, this court grants 3B Biofuels's motion to dismiss for lack of personal jurisdiction.  The reasons are explained below.

## I.    Background

3B Biofuels is a German limited liability company with headquarters in Brunsbuttel, Germany.  It is in the business of producing, blending, and selling biodiesel fuel.  3B Biofuels imports biodiesel fuel from sellers in North and South America and Asia for resale in Europe.  3B Biofuels does not maintain an office in Texas; does not have employees or agents in Texas; and is not authorized to conduct business in Texas.  (Docket Entry No. 8, Ex. A, Affidavit of Oliver Hancock, Managing Director of Babcock & Brown Biofuels GmbH, General Partner of 3B Biofuels, at ¶¶ 5–8).

LTG is a Delaware limited liability company with headquarters in Overland Park, Kansas.  LTG is a commodity trading firm that arranges transactions between buyers and sellers of whole grains, feed ingredients, biofuels, freight, and many other commodities.

In January 2008, 3B Biofuels wanted to buy Fatty Acid Methyl Ester ("FAME"), a type of biodiesel fuel made from vegetable oil.  Star Supply Renewables S.A., a commodities broker based in Switzerland, worked with 3B Biofuels and LTG on the contract at issue in this suit.  Doug Downing, a senior trader at LTG, negotiated with 3B Biofuels representatives via e-mail and telephone between Kansas and Germany.  An agreement for 3B Biofuels to buy biodiesel fuel provided by LTG was reached on January 4, 2008.  (Docket Entry No. 11, Ex. 1).  The contract was confirmed by Star Supply's broker confirmation note dated January 7, 2008.  (Docket Entry No. 11, Ex. A).

In the contract, 3B Biofuels agreed to purchase six cargo lots of FAME for delivery by the end of each month from July to December 2008.  Each lot was to be 4,200 metric tons (+/- 5%) at a fixed price per metric ton.  If the water at the loadport was above "300 ppm" the price was $1070.00 per metric ton.  If the water was "300 ppm" or below, the price was $1075.00 per metric ton.  LTG was responsible for acquiring the biodiesel fuel.  LTG was also responsible for designating the specific port and vessel onto which the biodiesel fuel would be loaded for transportation to Amsterdam, Rotterdam, or Antwerp.  The shipments were to be "C.I.F.," meaning that LTG would pay the cost, insurance, and freight to ship the biodiesel fuel by sea to the destination port and would provide 3B Biofuels with the documents to obtain the biodiesel fuel from the vessel or other carrier.  As defined by the International Chamber of Commerce, the term "C.I.F." also means that the buyer bears all risk of loss or damage to the goods from the time they pass the ship's rail at the port of shipment.  The contract between LTG and 3B Biofuels stated that "title of the product delivered hereunder and all risks in relation hereto shall pass from seller to buyer at vessel's manifold at loadport."  (Docket Entry No. 11, Ex. A).

For each shipment, three days after the bill of lading date and on receipt of the shipping documents from LTG, 3B Biofuels was to transfer the purchase price "in immediately available funds" to LTG's bank account in New York City.  After the biodiesel fuel  reached one of the European ports designated in the contract, 3B Biofuels would ship the product to its own facility in Germany.

The contract did not specify where the FAME would be produced or shipped from.

3

The contract stated that LTG would "nominate" the vessel to be used for each shipment at least 14 days before the first day of the delivery month. (Docket Entry No. 11, Ex. A). Each "nomination" included detailed information about the vessel, including the location of its loadport. Under the contract, 3B Biofuels would "give notice accepting or rejecting any vessel nominated . . . within 2 working days of receipt of such nomination . . . but shall not reject any nomination unreasonably" and would send "documentary instructions . . . 4 working days prior to vessel's arrival at loadport." (*Id.*). LTG asserts that this allowed 3B Biofuels to have a "significant measure of control over the details of the shipment." (Docket Entry No. 11, at 12). 3B Biofuels asserts that it could not do anything but veto LTG's choice and that it did not exercise this authority.

The FAME provided by LTG under the contract was a "blend of Soy Methyl Ester that was produced in Houston, Texas or aggregated from Midwest producers and Palm Methyl Ester that was produced in Houston, Texas." (Docket Entry No. 11, Ex. 1, Affidavit of Doug Downing, LTG Senior Trader, at ¶ 6). LTG stored the two grades of Methyl Ester in tanks it leased in Houston, where they were blended to produce FAME. (*Id.*). LTG asserts that 3B Biofuels knew that some of the FAME was produced in Texas, would be stored in Texas, and would be blended in Texas before being loaded onto a ship in the Port of Houston. (*Id.*). 3B Biofuels asserts that when it entered the contract, it did not expect any performance to occur in Texas and that LTG unilaterally selected the Port of Houston as the loadport.

Under the parties' contract, the biodiesel fuel was to be inspected to ensure sufficient

quantity and quality before loading.  The contract stated: "quality and quantity shall be ascertained at loadport by a mutually agreed independent inspector appointed by [LTG]," that "the quantity of product delivered by [LTG] and accepted by [3B Biofuels] shall be in the bill of lading in accordance with the measurements taken at the loadport," and that "the quality of the product shall be ascertained at loadport on shoretank sample by independent inspectors."  (Docket Entry No. 11, Ex. A).

For the first two fuel deliveries, in July and August, LTG notified 3B Biofuels that the biodiesel fuel would be loaded, inspected, and shipped from a vessel in the Port of Houston, Texas.  On June 12, 2008, LTG sent 3B Biofuels notice that the July delivery would be shipped on the *MT BEFFEN*, out of Houston, Texas.  (*Id.*, Ex. B).  Downing invited 3B Biofuels to "[p]lease advise your acceptance for our opening."  (*Id.*).  3B Biofuels accepted the vessel and loadport on June 16, 2008.  (*Id.*, Ex. C).  The July delivery was inspected and tested in Texas for quality and quantity.  (*Id.*, Ex. D).  A nitrogen blanket was applied to the FAME after it was loaded on the ship to protect quality during shipment.  (*Id.*, Ex. 1).  The July delivery arrived during the scheduled period and 3B Biofuels paid LTG.  (*Id.*).

On July 14, 2008, LTG informed 3B Biofuels that the August delivery would be sent on the *MT STELLA AZZURRA*, to be loaded at the Port of Houston between July 31 and August 2.  LTG asked 3B Biofuels to "[p]lease advise if acceptable."  (*Id.*, Ex. F).  3B Biofuels accepted the vessel and loadport on the following day.  (*Id.*, Ex. G).  The August delivery was also inspected and tested in Texas to ascertain its quality and quantity.  (*Id.*, Ex. H).  As with the July delivery, a nitrogen blanket was applied to the August delivery of the

5

FAME after it was loaded on the ship at the Port of Houston.  (*Id.*, Ex. I).  3B Biofuels paid LTG for the August delivery.

The shipping documents for both the July and August deliveries were created in Texas.  They include the bill of lading, documents reflecting measurement of the quantity of FAME shipped, the results of the quality inspection and testing, and a certificate of origin showing that the FAME originated in Texas.  (Docket Entry No. 11, Exs. E, I).

On August 12, 2008, LTG notified 3B Biofuels that the September delivery would be sent via the *MT VALERIE*, out of the Port of Houston, Texas, and asked 3B Biofuels if it "approve[d] this ship for a 2nd half August loading."  (*Id.*, Ex. J).  3B Biofuels accepted this vessel for the September delivery.  (*Id.*, Ex. K).  On August 27, 2008, the *MT VALERIE* arrived in the Port of Houston to begin loading the September FAME delivery.  (*Id.*, Ex. L).  Two days later, before the ship was loaded, the loading dock at the scheduled terminal was seriously damaged by an accident involving another ship.  (*Id.*, Ex. M).  The *MT VALERIE* crew had to find a different terminal to load the FAME.  (*Id.*).  On the same day LTG received notice of the damaged terminal, August 29, LTG informed 3B Biofuels of these events and declared *force majeure*.  (*Id.*).  LTG told 3B Biofuels that loading would be delayed because the FAME had to be placed on barges and brought to a different terminal before it could be placed on the *MT VALERIE*.  LTG did not anticipate an extensive delay but notified 3B Biofuels that the delay could be prolonged due to a hurricane that was forecast to cause disruptions at the Port of Houston the following week.  (*Id.*).

The September delivery was loaded onto the *MT VALERIE* on September 6 and 7,

2008.  LTG advised 3B Biofuels that the FAME had been loaded onto the ship.  On September 8, 3B Biofuels suggested that LTG find another buyer for the September shipment.  (*Id.*, Ex. O).  LTG asserts that 3B Biofuels was attempting to renege on its obligation to buy the September shipment because the price of this type of biodiesel fuel had been falling.  LTG attempted to find another buyer but was unsuccessful.  (*Id.*, Ex. 1, at ¶ 40).

The *MT VALERIE* left the Port of Houston on September 10, 2008.  This departure date was too late for an on-time arrival in Amsterdam, Rotterdam, or Antwerp.  On September 23, 2008, LTG advised 3B Biofuels that the September FAME delivery was estimated to arrive on October 4, 2008.  (*Id.*, Ex. N).  LTG sent 3B Biofuels an invoice for the September shipment.  (*Id.*).  3B Biofuels rejected the delivery, asserting that it was untimely, less than 4,200 metric tons, and consisted of PME, not FAME.  (Docket Entry No. 8, at 3).  3B Biofuels e-mailed LTG, stating that it believed LTG had breached the contract for the September shipment.  3B Biofuels asserts that LTG failed to nominate a ship for the remaining shipments in October, November, and December.  (*Id.*).  LTG asserts that 3B Biofuels wrongfully repudiated its contract obligations for the remaining three shipments of biodiesel fuel.  LTG filed this suit and 3B Biofuels moved to dismiss for lack of personal jurisdiction.

## II.    The Applicable Legal Standards

### A.    Rule 12(b)(2)

3B Biofuels moves to dismiss under Rule 12(b)(2) of the Federal Rules of Civil

Procedure.  When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction.  *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citations omitted).   "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Id.*  "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'"  *Quick Techs.*, *Inc. v. Sage Group PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994)).  The court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts."  *Stripling v. Jordan Prod. Co.*, *LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999)) (additional citations omitted).  The court is not obligated to credit conclusory allegations, even if uncontroverted.  *Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 868 (5th Cir. 2001).

**B.     Personal Jurisdiction**

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution.  *Delgado v. Reef Resort, Ltd.*, 364 F3d 642, 644 (5th Cir. 2004).  The Texas long-arm statute confers jurisdiction to the limits of due process.  *Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008); *see* TEX. CIV. PRAC. AND

REM. CODE ANN. § 17.041–.045; *see also Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003). Due process permits the exercise of personal jurisdiction over a nonresident defendant when the defendant has "minimum contacts" with the forum state and the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Wilson*, 20 F.3d at 647). LTG has the burden of demonstrating facts sufficient to support personal jurisdiction over 3B Biofuels.

The "minimum contacts" aspect of the analysis can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson*, 20 F.3d at 647. A court may exercise specific jurisdiction when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 446 U.S. 408, 414 n.8 (1984); *Religious Tech.*, 339 F.3d at 375; *Quick Techs., Inc.*, 313 F.3d at 344). To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Gundle Lining Const.,* 85 F.3d at 205; *Helicopteros Nacionales*, 466 U.S. at 414 n.8. Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzeqicz*, 471 U.S. 462, 475 (1985). "The non-resident's 'purposeful

availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Specific jurisdiction requires a sufficient nexus between the nonresident defendant's contacts with the forum and the cause of action. *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987). As part of the minimum contacts analysis, a court evaluates any contracts, the parties' "actual course of dealing," and the parties' "prior negotiations and contemplated future consequences." *Burger King*, 471 U.S. at 479.

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *Helicopteros Nacionales*, 466 U.S. at 414-15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir.1987). The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *Dalton v. R & W Marine*, 897 F.2d 1359, 1362 (5th Cir.1990). "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'" *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart*, 772 F.2d at 1191 (additional citations omitted)).

In this case, LTG does not argue that 3B Biofuels is subject to general jurisdiction in Texas. The issue is specific personal jurisdiction.

### III.  Analysis

LTG asserts that it has made a *prima facie* showing of specific jurisdiction.  LTG argues that 3B Biofuels purposefully availed itself of the benefits of conducting business in Texas because it received and accepted the nomination of a vessel in the Port of Houston for three shipments.  LTG contends that because 3B Biofuels accepted the Port of Houston as the loadport for the three shipments, it accepted everything that was done in Houston relating to those shipments, including the selection of Texas inspectors, inspections performed in Texas, and the creation of documents – such as the bill of lading – in Texas.  In addition, according to LTG, nearly all the contractual performance occurred in Texas.  The biodiesel fuel was accumulated and blended in holding tanks, transferred to the ship's cargo hold, measured, inspected, and prepared for shipment in the Port of Houston.  The bill of lading and other shipping documents were prepared in Houston.  Under the contract, title and the risk of loss passed to 3B Biofuels at the loadport in Houston.  LTG argues that jurisdiction is appropriate because Texas was the "hub" of the parties' activities.  LTG argues that if 3B Biofuels is not subject to specific personal jurisdiction in Texas, it would not be subject to jurisdiction anywhere in the United States.

3B Biofuels argues that all these contacts – which are its only Texas contacts – were the result of LTG's unilateral activity and cannot be the basis for personal jurisdiction.  3B Biofuels asserts that when it contracted with LTG, it "had no expectation that any aspect of the contract would be performed in Texas."  (Docket Entry No. 8, at 4).  The contract did not call for performance in Texas and, according to 3B Biofuels, the only arguable performance

11

in Texas was by LTG, which is insufficient to confer personal jurisdiction over 3B Biofuels. 3B Biofuels asserts that it did not become aware of any performance in Texas until after the contract was signed and LTG nominated ships out of the Port of Houston.  3B Biofuels asserts that it did not purposefully avail itself of the benefits and protections of Texas law because LTG unilaterally chose the shipping port.  3B Biofuels also argues that it is unclear whether title and the risk of loss passed in the Port of Houston because the contract is ambiguous at to when this occurred.  Although the contract stated that title will pass at "vessel's manifold at loadport," it also required arrival at the destination port by a certain date.  According to 3B Biofuels, the contract is ambiguous as to whether the cargo's failure to arrive by a certain date breached the contractual requirement to deliver the cargo or whether the contractual requirement was met when title passed at the loadport.

To determine specific personal jurisdiction in a breach of contract case, the court must ask whether the nonresident's forum contacts were instrumental in the formation of the contract or its breach.  *Burger King*, 471 U.S. at 478; *Religious Tech*, 339 F.3d at 375 ("In the specific jurisdiction rubric, only those acts which relate to the formation of the contract and the subsequent breach are relevant.").  The Fifth Circuit has stated:

> Although a single act by the defendant directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted, entering into a contract with an out-of-state party, without more, is not sufficient to establish minimum contacts. Rather, in a breach of contract case, to determine whether a party purposefully availed itself of a forum, a court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . ."

*Latshaw*, 167 F.3d at 211 (quoting *Burger King*, 471 U.S. at 479).  The place of performance is a "weighty consideration," even though it is not "automatically determinative" of personal jurisdiction.  *See  Electrosource Inc. v. Horizon Battery Techs.*, Ltd., 176 F.3d 867, 874 (5th Cir. 1999).  A plaintiff's unilateral decision to perform its part of the contract in the forum state diminishes this factor's weight.  *Command-Aire Corp. v. Ontario Mechanical Sales and Service, Inc.*, 963 F.2d 90, 94 (5th Cir. 1992).

A review of Fifth Circuit decisions analyzing minimum contacts in breach-of-contract cases provides helpful guidance.  The circuit has repeatedly held that merely contracting with a resident of the forum state is insufficient to subject the nonresident defendant to personal jurisdiction in the forum state.  Other insufficient contacts include mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and even sending representatives to the forum state.  These contacts may be sufficient for specific personal jurisdiction when the contract contemplates a long-term relationship between the nonresident defendant and a forum resident.  When personal jurisdiction is found based on a contract between a forum resident and nonresident, the plaintiff has made a *prima facie* showing that the nonresident defendant has purposefully acted in some way that at least causes business activity to occur within the forum state.

In *Hydrokinetics*, *Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), the court held that personal jurisdiction was lacking over an Alaska corporation that agreed to purchase goods manufactured in Texas, agreed to pay for the goods in Texas, communicated extensively with the plaintiff before contracting, and sent representatives to Texas twice,

once to inspect the manufacturing facilities and once to resolve a dispute relating to the contract. *Id.* at 1028–29. Although the plaintiff was to perform the contractual obligations in Texas, the defendant's contractual performance in Texas was limited to paying for the goods. *Id.* The defendant did not regularly engage in business outside Alaska and the agreement to purchase the goods was "initiated by and substantially negotiated with" one of the plaintiff's representatives in Alaska. *Id.* The court noted that the case involved a single transaction as opposed to a continuing relationship with the forum state. *Id.* The court also found it significant that the contract provided for the application of Alaska law and that the plaintiff delivered the products to the defendant outside Texas. *Id.* The facts that defendant sent payments to Texas and that the parties communicated from their respective locations during contract negotiations did not weigh in favor of exercising jurisdiction in Texas. *Id.* The court concluded: "considering the totality of the facts of this case, the necessary inference of purposeful availment is not supported." *Id.* at 1029–30.

In *Stuart*, the court determined that a Texas court did not have personal jurisdiction over an individual defendant who entered into a contract with a Texas resident, shipped goods into Texas for modification, sent letters and made telephone calls to the plaintiffs in Texas, received communications from the plaintiffs, agreed to a choice-of-law provision selecting Texas law, and mailed payments to Texas. 772 F.2d at 1192–1194. The court concluded that it was the quality of the forum-state contacts, not the number or timing, that was important to the minimum-contacts analysis. The nonresident defendant's contacts were not of a sufficient quality to show that the defendant purposefully availed itself of the

14

benefits of conducting business in Texas.  The choice-of-law provision was insufficient, either standing alone or considered with the other contacts, to justify the exercise of personal jurisdiction over the defendant.  *Id.* at 1196.  The court concluded that the "provision contemplate[d] a choice of law not forum" and thus did not "evince [plaintiffs'] anticipation of being haled into a Texas court."  *Id.* at 1195.

In *Gundle Lining Construction*, 85 F.3d at 205, the court found personal jurisdiction based on the defendant's contract with the forum-state plaintiff, combined with the facts that the defendant mailed payments to the plaintiff in the forum state and engaged in communications with the plaintiff during the negotiation and performance of the contract. The key difference between *Stuart* and *Gundle Lining Construction* was a contract provision that allowed the plaintiff to file suit "to recover on the labor and materialman's bond" in any "State in which such labor was performed, services rendered, or materials furnished."  *Id.* at 206.  The court acknowledged that although the provision was neither a choice-of-law nor a choice-of-forum clause, it "resemble[d] the latter."  *Id.*  Because labor under the contract was performed in the forum state, the exercise of personal jurisdiction over the nonresident defendant was not unreasonable.  *Id.*

A few years after *Gundle Lining Construction*, the court found that, despite a choice-of-law provision in the parties' contract selecting the law of India, a Texas court could exercise personal jurisdiction over the Indian defendant who, as a result of "extensive negotiations," entered into a contract with the plaintiff in Texas that called for more than one transaction.  *Electrosource, Inc.*, 176 F.3d at 870, 872.  The defendant in *Electrosource*

15

solicited the plaintiff's business in Texas, contemplated an ongoing relationship with the Texas plaintiff, corresponded extensively with the plaintiff in Texas, sent at least six different representatives to Texas on six separate visits related to the contract, and made contract payments to the plaintiff in Texas. *Id.* at 872. The plaintiff contracted to train the defendant's employees in Texas, to provide design assistance and advice to the defendant in Texas, and to monitor the defendant's product uniformity and quality control at least partially from Texas. *Id.* at 872-73. The court noted that the "actual course of dealing . . . involved wide reaching contacts and contemplated future consequences with the forum state." *Id.* The court summarized the defendant's significant contacts with the forum state, as follows:

> [The defendant] sought out [the plaintiff] for a particular technology that had been developed in [the forum state], negotiated for its acquisition in [the forum state], entered into an agreement for the transfer of technology in [the forum state], and began the process of training, designing, and preparation in [the forum state] necessary to the transfer of technology."

*Id.* at 873-74. The court distinguished *Hydrokinetics, Inc.* on the basis of the greater quantity and quality of the nonresident's contacts with the forum state. See *id.* at 873.

Similarly, in *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376 (5th Cir. 2003), the long-term nature of the agreement was important to the court's personal jurisdiction analysis. In that case, the nonresident defendant sent two representatives to the forum state for a preliminary meeting that ultimately led to negotiations and a long-term agreement under which the parties would use each other's services. *Id.* at 379, 382. The parties negotiated the contract via telephone and written communications. *Id.* at 382. The

court found that because the contract contemplated a long-term relationship, the defendant's contacts with the forum state could not be "characterized as random, fortuitous, or attenuated." *Id.* at 383 (internal quotation marks omitted).  Rather, the court concluded that the nonresident defendant purposefully affiliated itself with a company based primarily in the forum state and with its customers primarily from the forum state.  *Id.* at 382.  Even though the nonresident defendant, a freight delivery company, did not pick up or deliver freight in the forum state, it "took purposeful and affirmative action by entering into the [agreement], providing [the plaintiff] with pricing and shipping information, and agreeing to accept shipments" from the forum state "that had the clearly foreseeable effect of causing business activity in the forum state."  *Id.* (internal quotation marks omitted).

3B Biofuels cites *Hydrokinetics*, *Inc.* and *Stuart* to support the argument that it lacks the minimum contacts with Texas required to subject it to personal jurisdiction in this court. Based on the record, 3B Biofuels's contacts with Texas are less substantial than those of the defendants in *Hydrokinetics*, *Inc.* and *Stuart*.  LTG is not a Texas resident and does not have any office in Texas.  3B Biofuels did not contract with a Texas resident.  3B Biofuels did not negotiate with or communicate with a Texas resident, nor did it send a representative to Texas.  3B Biofuels did not make payment to LTG in Texas.

LTG argues that *Hydrokinetics, Inc*. and *Stuart* are distinguishable because they did not involve any significant contractual performance in the forum state.  In contrast, the FAME that was the subject of the parties' contract in this case was blended, inspected, and loaded in Texas and, according to LTG, title and the risk of loss passed in the Port of

Houston.  This argument is unpersuasive.  The court in *Hydrokinetics, Inc*. emphasized that the contract did not require the defendant to perform in Texas, other than perhaps pay for the goods.  700 F.2d at 1029.  Similarly, the contract in *Stuart* only required the nonresident defendant to make payments to the plaintiff's bank in Texas.  772 F.2d at 1188.  In the present case, the contract did not provide for *any* of the contract performance to take place in Texas.  3B Biofuels did not engage in any purposeful or affirmative act directed at Texas or that would cause business activity in Texas.

LTG relies on *Mississippi Interstate Express*, *Inc. v. Transpo*, *Inc.*, 681 F.2d 1003 (5th Cir. 1982), and *Southwest Offset*, *Inc. v. Hudco Publishing Co.*, *Inc.*, 622 F.2d 149 (5th Cir. 1980), for the proposition that a nonresident defendant is subject to personal jurisdiction in the forum state if it was "reasonably foreseeable that the plaintiff would perform a material part of its contractual obligations in that state," the defendant was not a mere "passive customer," and the forum state "was clearly the hub of the parties' activities."  In *Transpo*, the plaintiff, a Mississippi trucking firm, contacted and entered into an agreement with the defendant, a California freight broker, under which the plaintiff would supply trucks to move goods for the defendant on an open-account basis.  681 F.2d at 1005.  During the next two months, the defendant initiated and directed 19 shipments of its goods on the plaintiff's trucks.  None of these shipments had an origination or destination point in Mississippi, though some shipments passed through the state.  The defendant argued that it was not subject to jurisdiction in a Mississippi court because it negotiated the agreement from California, did not send any representatives to Mississippi, and did not do any act inside

18

Mississippi. *Id.* The court found personal jurisdiction in Mississippi appropriate because the defendant was "no mere passive customer" of the plaintiff and it was reasonably foreseeable that the plaintiff would perform its contractual obligation in Mississippi. *Id.* at 1009. The court noted that the defendant "exercised a significant measure of control" over the shipments, the "relationship between the parties was sustained (not "single" or "fortuitous"), and the plaintiff performed its part of the undertaking at its sole place of business in Mississippi as was known to the California defendant at the outset of their relations." *Id.*

In *Southwest Offset*, the Texas court found personal jurisdiction over an Alabama publisher sued for breach of contract by a Texas printer. 622 F.2d at 152. The plaintiff's sales representative had solicited the defendant in Alabama to have the plaintiff print its telephone directories. After the initial order, the defendant placed eight orders in writing or over the phone with the plaintiff in Texas. The defendant sent some payments to the plaintiff's office in Texas. No one associated with the defendant ever visited Texas. Printing the directories involved the efforts of both parties: the defendant in Alabama prepared camera-ready copy, which it sent to the plaintiff in Texas; the plaintiff then prepared proofs, which were sent back to Alabama for the defendant's approval; the defendant returned the corrected proofs to the plaintiff in Texas; the plaintiff printed the phone books and sent them to defendant F.O.B. Dallas. *Id.* at 150. The court noted that Texas was "probably the place of most of the contracts, since all except the first of [defendant's] offers to print were accepted by [plaintiff] in Texas." *Id.* at 152. The court emphasized that the Alabama defendant was "no mere passive customer" of the Texas plaintiff because the defendant was

19

actively engaged in the preparation of each separate order and sending the copies to Texas was a "necessary part of [its] contract performance." *Id.* The nature of the orders for printing showed that the defendant's contacts with Texas were not "single and fortuitous," but rather repetitive and sustained. *Id.*

In *Moncrief Oil Intern. Inc. v. OAO Gazprom*, 481 F.3d 309 (5th Cir. 2007), the court distinguished *Transpo and Central Freight Lines* on the ground that those cases involved "a plaintiff that only existed within the forum state, and a defendant actively engaged in the various activities taking place therein." *Id.* at 313. In *Moncrief*, by contrast, the plaintiff was headquartered in Texas but had locations internationally, and the defendant was not actively engaged in any of the plaintiff's activities in Texas. The plaintiff, a Texas corporation, filed suit in Texas against several Russian-based defendants for breach of contract. The contract was negotiated and executed in Russia and provided for arbitration in Russia, under Russian law. The plaintiff argued that the Russian defendants had established minimum contacts with Texas by: contracting with the plaintiff with knowledge that the plaintiff was a Texas resident; acknowledging and approving of the plaintiff's substantial contract performance in Texas; and sending an executive to visit Texas in furtherance of that performance. The plaintiff cited *Central Freight Lines* and *Transpo* to argue that personal jurisdiction existed over the Russian defendants because it was reasonably foreseeable to them that the Texas plaintiff would perform a material part of the contractual obligations in Texas and thereby cause business activity in Texas. The court rejected the plaintiff's argument, concluding that *Central Freight Lines* and *Transpo* were distinguishable. *Id.* In addition to the facts that the

20

plaintiff had locations internationally, and the defendants were not actively engaged in any of the plaintiff's activities in Texas, "[t]he contract was silent as to location" and there was "no indication that the location of the performance mattered" or that the defendants had contracted with the plaintiff because of its Texas headquarters. *Id.* The court explained that the clauses requiring arbitration in Russia and choosing Russian law suggested that the defendants "meant for the undertaking to remain wholly Russian in nature." *Id.*

LTG argues that this case is similar to *Transpo* and *Southwest Offset* because 3B Biofuels "exercised a significant measure of control over the details of the shipment" and could have rejected the Port of Houston as the loadport for the July, August, or September deliveries, but did not. Instead, according to LTG, "3B Biofuels accepted the Port of Houston and all of the acts that came with that designation." (Docket Entry No. 11, at 2). LTG argues that, as in *Transpo*, Texas was the "hub" of the parties' activities under the contract because nearly all the performance, including the passage of title and risk of loss, occurred in Houston, Texas. LTG contends that its performance in Texas was reasonably foreseeable for the September shipment because 3B Biofuels had accepted the Port of Houston for the first two shipments under the installment contract.

In the present case, the decisions in *Transpo* and *Southwest Offset* are distinguishable for some of the reasons that were pointed out in *Moncrief.* LTG is not a Texas company and does not exist "only within the forum state." LTG is a Kansas company with both domestic and international locations and activities. The present case did involve contractual performance over several months as opposed to a single or fortuitous act, as well as

21

reasonably foreseeable contractual performance by LTG in Texas for the September delivery. But, as in *Moncrief*, there is no basis to conclude that the nonresident defendant engaged in a purposeful or affirmative act that would subject it to jurisdiction in Texas. The holdings in *Transpo* and *Southwest Offset* were based in part on the fact that the defendant was actively engaged in the plaintiff's contractual performance in the forum state. *See Transpo*, 681 F.2d at 1009 ("All shipments were initiated by defendant, the tasks of directing the details of such shipments were ones in which defendants exercised a significant measure of control . . . ."); *Southwest Offset*, 622 F.2d at 152 (the nonresident defendant, as "necessary part of [its] contract performance," "several times mailed camera-ready copy and proofs to Texas in order to facilitate the manufacturing process"). In this case, it was up to LTG to arrange to ship the FAME, including designating the loadport. LTG could select a different loadport for each shipment. The fact that LTG designated the Port of Houston for the first three shipments and 3B Biofuels accepted that designation does not support an inference that 3B Biofuels exercised significant control over the FAME shipments or was significantly involved in LTG's performance of its contractual obligations for those shipments. *See M & G Polymers USA v. CNC Containers Corp.*, 190 F.Supp.2d 854, 856–57 (S.D. W.Va. 2002) (finding no purposeful act where a contract for the sale of goods allowed the plaintiff-seller to choose the origin of shipment and the defendant-buyer merely ordered and accepted goods from a location in the forum state that was chosen by the seller).

The contract provided that 3B Biofuels was allowed to accept or reject the loadport designated by LTG, but would not unreasonably reject the chosen location. 3B Biofuels

asserts that the location of the loadport did not matter for the purchase of FAME.  Merely accepting, or not rejecting, LTG's designation of the Port of Houston does not equate to exercising "significant control over the details of the shipment."

Unlike the defendants in *Transpo* and *Southwest Offset*, and like the defendant in *Moncrief*, 3B Biofuels was not actively engaged in the plaintiff's contractual activities that took place in Texas.  3B Biofuels did not initiate or direct the details of the shipments.  The bill of lading and other commercial documents were prepared by LTG or third parties in Texas.  There is no indication that 3B Biofuels contracted with LTG because of its Texas location, or that it accepted the Port of Houston designation for strategic business reasons.  Based on the record evidence, 3B Biofuels did not engage in a purposeful act that caused business activity in Texas.  3B Biofuels's Texas contacts were limited to accepting LTG's designations of the Port of Houston for the shipments under the contract.  That is insufficient for the exercise of personal jurisdiction over 3B Biofuels by this Texas court.

LTG's argument that title and risk of loss passed in Texas does not alter the analysis.  The contract appears to be ambiguous.  Even if, however, the contractual ambiguity was resolved in LTG's favor, having title and risk of loss pass to 3B Biofuels in Texas, considered either alone or with 3B Biofuels's acceptance of the Port of Houston as the loadport, is insufficient to establish minimum contacts with Texas.  The existence of a Free On Board ("F.O.B.") term in a contract, which is similar to a C.I.F. term, is one factor to consider in determining whether the defendant has "minimum contacts" with the forum state.  *See Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 188–89 (5th Cir. 1978)

23

(concluding that F.O.B. shipment, without more, is not purposeful availment of the laws of the forum state); *Bell Paper Box*, *Inc. v. U.S. Kids*, *Inc.*, 22 F.3d 816, 820 n.2. (8th Cir. 1994) (holding that a "delivery term in a contract [can] not create sufficient contacts to uphold jurisdiction" but "[s]uch delivery terms are not irrelevant to a finding of personal jurisdiction"). 3B Biofuels did not affirmatively act to cause that title and risk of loss would pass in Texas. As with the loadport designation, the fact that title and risk of loss may have passed in Texas was the result of LTG's unilateral activity designating a Texas loadport and is insufficient to create minimum contacts with Texas.

The conclusion that 3B Biofuels lacks minimum contacts with Texas is bolstered by the decision in *M & G Polymers USA v. CNC Containers Corp.*, 190 F.Supp.2d 854 (S.D. W. Va. 2002). That case also involved a contract in which the plaintiff chose the origin of the shipments and the carrier. *Id.* at 856–57. Under the contract, executed in December 1999, a Washington corporation agreed to buy from a Texas corporation at least 50,000 pounds of PET resin annually for a two-year period. The contract negotiations occurred in Texas and Washington. The contract contained a Texas choice-of-law provision. The contract did not state where the PET resin would be manufactured or shipped from. Instead, the contract stated that the "Seller will select the origin of shipments and the carrier" and the FOB point was "Seller's shipping location, freight prepaid." *Id.* at 856. In June 2000, the Texas seller was acquired by another company based in West Virginia. After purchasing 27,000 pounds of PET resin between January and October 2000, the Washington corporation suspended further purchases. The seller sued the Washington buyer for breach of contract

24

in West Virginia and the buyer moved to dismiss for lack of personal jurisdiction.  The plaintiff argued that although the contract did not mention West Virginia, the parties knew the PET resin would be shipped from West Virginia because when the contract was signed, the Texas company's only PET resin plant was located in West Virginia, and during the contract, the defendant sent its purchase orders to the West Virginia plant.  The court rejected this argument and dismissed the defendant for lack of personal jurisdiction.  *Id.* at 857.

In granting the motion to dismiss, the court noted that although the defendant could have surmised that the shipment would be from West Virginia, the contract did not require the plaintiff to ship from West Virginia, and the defendant had no control over the product's shipment.  That decision was unilaterally made by the plaintiff.  And the defendant had no other involvement with the plaintiff's contract performance in West Virginia.  The defendant did not visit, negotiate, or enter into the contract with the West Virginia office of the plaintiff.  The court held that the defendant "merely had incidental contact with West Virginia because it had to order and accept shipment of the product from the location selected by the Plaintiff."  *Id.* at 858.  Those contacts were insufficient to find that the defendant had "purposefully availed" itself of the privilege of conducting business in West Virginia.  *Id.*

As in *M&G Polymers*, the contract at issue in this case gave LTG the right to choose the vessel and origin of shipment.  The fact that 3B Biofuels had the contractual authority to reject LTG's Texas choice is insufficient to find that the failure to do was purposeful availment of the privilege of conducting business in Texas.  3B Biofuels contracted with a

Kansas company to purchase a product that could be shipped from any number of locations. 3B Biofuels's only contact with Texas was the result of LTG's choice of the Port of Houston as the origin for the FAME shipments.  3B Biofuels did not have any other contact with Texas.[1]

3B Biofuels did not purposefully avail itself of the privilege of conducting activities in Texas in connection with this contract.  The pleadings and the parties' submissions show that the contact 3B Biofuels had with Texas was dependent on the unilateral activities of LTG, which chose the vessel and loadport and initiated and directed the details of the Texas shipments.  The unilateral activity of LTG in shipping the FAME from Texas cannot serve as the basis for exercising personal jurisdiction over 3B Biofuels in Texas.

Because 3B Biofuels lacks minimum contacts with Texas, this court need not determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice.  *Southern Copper, Inc.*, 2000 WL 1910176, at *4 (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 329 n.20 (5th Cir. 1996) ("Because we find that the first due process condition of minimum contacts was not satisfied, we need not address whether the exercise of personal jurisdiction in this case would offend traditional

---

[1]  The absence of a choice-of-law provision designating the law of a state other than Texas does not remove this case from the rationale behind *M&G Polymers* or even *Moncrief*.  The Fifth Circuit has recognized that the absence of a choice-of-law provision might "give[] the defendant reason to believe it could not be haled into court in the forum state."  *Moncrief*, 481 F.3d at 313 (citing *Central Freight Lines*, 322 F.3d at 383). Although LTG's contractual performance occurred mostly in Texas and was reasonably foreseeable to 3B Biofuels, that performance was not the result of 3B Biofuels's purposeful action.  The absence of a choice-of-Texas-law provision is an added reason why 3B Biofuels could not reasonably expect that it could be haled into a Texas court.

notions of fair play and substantial justice"); *Baldwin v. Household, Int'l, Inc.*, 36 S.W.3d 273, 277 (Tex. App.–Houston [14th Dist.] 2001, no pet.) (the court would "not reach the 'fair play and substantial justice' analysis" because plaintiff failed to establish defendant's minimum contacts with Texas).

**IV.    Conclusion**

3B Biofuels lacks minimum contacts with Texas to justify the assertion of personal jurisdiction by this court.  3B Biofuels's motion to dismiss for lack of personal jurisdiction is granted.  This case is dismissed by separate order.

SIGNED on April 27, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

27